```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                      JACKSONVILLE DIVISION

BRUCE SCUDDER,                      Jacksonville, Florida

           Plaintiff,              Case No. 3:21-cv-741-TJC-JBT

  vs.                               June 3, 2024

SOFI LENDING CORP., et al.,         2:18 p.m.

           Defendants.              Courtroom No. 10D
_____



              TELEPHONIC FINAL PRETRIAL CONFERENCE
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                UNITED STATES DISTRICT JUDGE



  COURT REPORTER:

       Shannon M. Bishop, RDR, CRR, CRC
       300 North Hogan Street, Suite 9-150
       Jacksonville, FL  32202
       Telephone:  (904)549-1307
       dsmabishop@yahoo.com


     (Proceedings recorded by mechanical stenography;
  transcript produced by computer.)
```

2

A P P E A R A N C E S

COUNSEL FOR PLAINTIFF:

    **DURAN L. KELLER, ESQ.**
    Keller Law, LLP
    8 North Third Street, Suite 403
    Lafayette, IN  47901

    **MAX H. STORY, ESQ.**
    Max Story Law
    328 2nd Avenue North
    Jacksonville Beach, FL  32250

    **SCOTT CRAIG BORISON, ESQ.**
    Borison Firm, LLC
    1400 South Charles Street
    Baltimore, MD  21230

COUNSEL FOR DEFENDANT SOFI LENDING CORP.:

    **JENNY NICOLE PERKINS, ESQ.**
    Ballard Spahr, LLP
    1735 Market Street, 51st Floor
    Philadelphia, PA  19103-7599

    **MITCHELL LEE TURBENSON, ESQ.**
    Ballard Spahr, LLP
    1 East Washington Street, Suite 2300
    Phoenix, AZ  85004

COUNSEL FOR DEFENDANTS LVNV FUNDING, LLC, AND RESURGENT CAPITAL
SERVICES L.P.:

    **LAUREN M. BURNETTE, ESQ.    (LVNV Funding and Resurgent)**
    **JOHN MICHAEL MAREES, II, ESQ,**
    Messer Strickler Burnette, Ltd.
    12276 San Jose Boulevard, Suite 718
    Jacksonville, FL  32223

P R O C E E D I N G S

June 3, 2024                                              2:18 p.m.

- - -

THE COURT:  Good afternoon.  We're on the record in *Scudder versus Resurgent Capital, et al.*, Case No. 3:21-cv-741.

I apologize for the delay.  We just have been plagued with gremlins on our remote hearings.  We try the telephone and it's bad.  And then we tried to go over to Zoom.  And I don't know what happened with it.  And now we're back to telephone.

So hopefully -- I'm about ready to just say everybody needs to come in person to every hearing, because we can't seem to -- can't seem to get this part of it right.  I don't know why, but we'll try to figure it out.

So, anyway, we are here for a continuation of the final pretrial conference in this case.  I'm taking it -- and I've got a list of the lawyers who are here.  I'm not going to call them all out.  I will say to you that before you speak you need to identify yourself so the court reporter can get everybody straight.

I take it -- I don't know who's speaking for the plaintiff.  But I take it that despite my entreaties, despite the option -- the settlement opportunity I provided -- and I think somebody told me there was some kind of a deadline -- and I take it the fact that we're on this call means that there's been no settlement.

1         Is that right?

2         MR. BORISON:  Scott Borison, Your Honor.  Yes, that's

3    correct.

4         THE COURT:  Okay.  Well, of course, it's my job to

5    give y'all a fair trial, and I'll do that.  After having

6    reviewed this again, and now getting more in depth to it, it

7    sure seems like a case that ought to be able to be settled.

8         I don't know what the hang-up is.  I hope -- I hope

9    there's not anybody who thinks they're so right about this that

10   there's no room for error.  And I certainly hope that everybody

11   has really paid attention, because, you know, you're getting

12   ready to spend a bunch of time and money.  And I just -- it's

13   just hard for me to think what's -- what would be a hang-up to

14   settle a case like this.

15        I mean, it's -- so I don't think the fact that you

16   haven't settled it now means it won't settle before you go to

17   trial.  I certainly would encourage you to keep trying.

18        But I think I've done -- other than actually get

19   y'all in a room and find out what's going on, which I don't

20   think is a good idea since I'm going to be trying the case, I

21   don't know what else I can do.  So if -- if we're going try the

22   case, we'll try the case.

23        But I can tell you already from reading your papers

24   you-all have a pretty different view on how this case ought to

25   be tried.  You have a pretty different view on how -- how it

1    should go.  And I'll tell you, neither one of you is likely to

2    be satisfied with all the rulings you're going to get from me.

3    But here we go.

4          I was commenting to Ms. Gray, my law clerk who's

5    working on this, that in concept this case is very simple.  The

6    questions seem to be did the plaintiff properly notify and

7    provide sufficient information to the defendants to trigger an

8    investigation, and, if so, did the defendants, with the

9    information they had, perform a reasonable investigation.

10         You know, I can understand that.  A jury could

11   understand that.  And I assume that's what the witnesses will

12   be talking about.

13         It's when you get into the law in these areas where

14   it gets a little tricky.  I have always thought that these

15   consumer -- supposedly consumer-based statutes are overly

16   complicated.  They have a lot of legal mumbo-jumbo in them.

17   They have a lot of subparts and subsections and so forth.  And

18   I never find any of it to be particularly interesting or -- or

19   all that clear.  And then, of course, you've got the overlay of

20   the different statutes, each of them a little different.

21         And that's where I think a jury won't necessarily

22   appreciate the case.  They'll be able to understand did

23   somebody -- did somebody bring it to somebody's attention and

24   did that person do what they were supposed to do.  They'll be

25   able to understand that.  The rest of it I -- I don't know,

6

1   but -- and I haven't had a chance to look at your jury

2   instructions.

3           I assume that -- I assume they're patterns.  But I

4   haven't really had a chance to look at them, because -- I just

5   haven't.  But, anyway, I have had a chance to look at your

6   second amended joint final pretrial statement.  And I'm glad

7   you were able to put it together after a false start.

8           And I'm going to go through this with you and just

9   flag a couple of things.

10          So Judge Barksdale is going to pick the jury with

11  your consent.  I saw that y'all did consent in the stipulation.

12  So Judge Barksdale has agreed to pick your jury.  I tried to

13  get everybody to agree to pick it Monday afternoon, but I guess

14  that didn't work.

15          So she'll pick it starting at 10 o'clock on Tuesday,

16  the 11th.  And I'm going to let her decide -- I saw there was a

17  motion filed for attorney voir dire.  I'm going to let her

18  decide that issue since she's picking the jury.

19          But, you know, we should have a jury by lunchtime or

20  early afternoon.  And if we do, which I would expect we will,

21  we'll go ahead and start the trial.  You'll go ahead and give

22  your opening statements, which I can't imagine will take more

23  than 30 minutes each, and -- if that.  But -- I'll give you 30

24  minutes, but don't feel like you've got to use it all.  And

25  I -- and then we'll get -- if we still have time, we'll start

 1   with witnesses.  So you need to be ready to go on Tuesday.

 2          If we're not going to -- if we're not going to start

 3   Tuesday morning, which is what I was hoping we would do, you

 4   need to be ready to go Tuesday afternoon, right after we get

 5   the jury, and -- and then we'll try the case to conclusion.

 6          My rules are that you have to notify the other side

 7   the day before what witnesses you're intending to call.  So

 8   that would mean the plaintiffs would have to notify the

 9   defendants on the Monday before which witnesses they're

10   intending to call Tuesday afternoon and Wednesday morning, and

11   then it will -- at the end of the trial day, whoever has got

12   control of the case will tell us which witnesses they're going

13   to call and in what order so everybody is not surprised if it

14   happens differently.

15          And Judge Barksdale will read a statement of the

16   nature of the case to the venire.  I'm pretty sure it won't be

17   the one either one of you gave to us.  It will be shorter and

18   more vanilla, but she'll take care of that.

19          So I'm looking through here.  I did find it somewhat

20   helpful to read the -- both sides of the story that you -- that

21   you gave me so I -- you know, as I continue to try to get

22   conversant with the facts of the case.

23          And, of course, it's trite to say, but, of course,

24   the proof's in the pudding, meaning that it's fine for you-all

25   to write all this stuff in a pleading, but are you actually

1    going to have witnesses that are going to get on the stand and

2    say the stuff that you think is going to be said?  Do you

3    actually have documents that will support all this?  And so

4    that will -- I guess we'll see about that.

5            With respect to Mr. Hendricks, I saw that the

6    defendants made another run at a *Daubert* challenge to him, but

7    I've already ruled on *Daubert*.

8            But I do agree with the defendants, there's not a

9    whole lot that he's going to be able to say.  Because if I

10   understand it, he didn't really, like, look at any of the

11   specifics of this situation.  I think I'm right about that.

12           Who's talking for the plaintiff about Mr. Hendricks?

13   You know, what's he going to -- he didn't really look at this

14   file, did he, or these facts?  Did he?

15           MR. KELLER:  Your Honor, this is Duran Keller for the

16   plaintiff.  Mr. Hendricks is an expert in the area of credit

17   reporting and dispute.  So he's going to talk to the jury about

18   the general process and the information that he received from

19   the defendants themselves.

20           THE COURT:  All right.  Well, I'm going to let him

21   testify, or at least I haven't ruled him out, but I'm not going

22   to let him do something that he hadn't done before.  I'm not

23   going to let him rely on things that he didn't have.  I'm not

24   going to let him talk about -- I'm certainly not going to let

25   him characterize things, in terms of liability or -- or

1   anything.

2           So, you know, we'll see.  But I'm -- I mean, maybe it

3   will be helpful to the jury.  And I wasn't prepared to rule him

4   out, but I also am not going to let him just get up there and

5   say whatever he wants to say, so -- so just keep that in mind.

6           All right.  I'm looking here at the witness list for

7   the plaintiffs, which is on page 9 of the stip.  Let me just

8   ask you.

9           I think there was an objection -- if I got this

10  right, there's an objection by the defendants to a JSO

11  representative testifying.  And I think it was based on no

12  Rule 26 disclosure about that, I think.

13          But what's the JS- -- who's the JSO representative

14  that's going to testify?  And what are they going to say?

15          MR. BORISON:  Your Honor, this is Scott Borison.  A

16  JSO representative is going to testify that there was a call

17  made to Mr. Scudder's home as a result of the phone call he

18  made to them to report the identify theft, and also whether or

19  not they produced police reports in response to an identify

20  theft complaint.

21          THE COURT:  Who is the actual person that's going to

22  testify?

23          MR. BORISON:  We don't know who the person is that

24  they designate.

25          THE COURT:  Well, have you subpoenaed somebody?

1          MR. BORISON:  We --

2          THE COURT:  Have you subpoenaed somebody?

3          MR. BORISON:  We did not subpoena them.  We had

4    talked to them and they said it wasn't necessary, but we can

5    issue a subpoena.

6          THE COURT:  Well, only if you want them to show up, I

7    guess.  But when you say "they" and "who" and you don't know

8    who it is, that sounds awful squishy to me.  I mean, you know

9    you're going trial in a week, right?

10         MR. BORISON:  Yes, Your Honor.

11         This is Scott Borison.  Yes.

12         THE COURT:  So how are you -- so who's going to be

13   able to testify that a phone call was made?  Is that based on

14   records or something?

15         MR. BORISON:  Yes.  There's a -- they have a call

16   log -- I'm sorry, Your Honor.  This is Scott Borison again.

17         They have a call log to show calls made to particular

18   addresses.

19         THE COURT:  Okay.  And has that -- has that call log

20   been produced?

21         MR. BORISON:  Yes, Your Honor.

22         THE COURT:  Okay.  And what are they going to say

23   about whether they generate police reports in identify theft

24   cases?

25         MR. BORISON:  Scott Borison, Your Honor.  It's our

1  understanding they're going to testify that they do not do

2  police reports for identify theft cases.

3        THE COURT:  Okay.  So that's a fairly big deal, I

4  guess, in the case, because y'all are fussing about the police

5  reports and what to do with them, and so are the other side.

6        So who wants to speak for the defendant?  What's the

7  objection to the -- to the testimony?

8        MS. BURNETTE:  Your Honor, this is Lauren Burnette

9  for defendants Resurgent and LVNV.  My clients do not object to

10 a JSO representative testifying.

11       THE COURT:  Okay.  What about the other defendants?

12       MS. PERKINS:  And this is -- excuse me, Your Honor.

13       This is Jenny Perkins on behalf of defendant SoFi.

14 Our objection is based on the fact it was not in any of the

15 supplemental disclosures.  Plaintiff made a supplemental

16 disclosure on the case at the close of discovery listing a

17 number of instances --

18       THE COURT:  Hold on.  We -- hold on, ma'am.  We

19 can't -- I'm sorry.  We're --

20       COURTROOM DEPUTY:  I'm going to mute it just for a

21 second, Judge.

22    (Judge confers with courtroom deputy.)

23       COURTROOM DEPUTY:  You're on.

24       THE COURT:  All right.  We're -- we hope -- we hope

25 we can hear you better.  We're having -- you're the only one

1    that -- you're breaking up a little bit on us, but go ahead and

2    try again, ma'am.

3         MS. PERKINS:  Thank you, Your Honor.  Jenny Perkins

4    on behalf of defendant SoFi.

5         Our objection is based on the fact that plaintiff

6    never disclosed this witness or any witness from JSO in any of

7    his supplemental disclosures.  We note that on the eve of the

8    close of discovery plaintiff sent a supplemental disclosure

9    listing a lot of new individuals, but no representative of JSO,

10   or even JSO, was listed.

11        THE COURT:  All right.  What do you say about that,

12   Plaintiffs?

13        MR. BORISON:  Your Honor, Scott Borison.

14        Actually, we had provided a copy of the JSO log --

15   the call log as -- in part of our response to requests for

16   admission.

17        So it was in discovery disclosed that the

18   Jacksonville Sheriff's Office had a log of the calls made to

19   Mr. Scudder's address.  And I don't have the exact date in

20   front of me, Your Honor, but that was in response to the

21   request for admission.

22        THE COURT:  Well, what about the issue of -- that no

23   police report was required?  When did that surface?

24        MR. BORISON:  Your Honor, that surfaced through the

25   testimony of our client explaining that during his deposition.

1    So we don't think it's any surprise is our position in this

2    particular case, Your Honor, because there was no efforts or

3    action taken by the Jacksonville Sheriff's Office.

4            And you might have seen that ended up being turned

5    over as evidence to the Secret Service.  And we anticipate a

6    Secret Service agent who's now retired would be testifying.

7    But that's part of what we'd present to the jury.

8            THE COURT:  All right.  And I'm still not quite sure

9    how this is working.  You've talked to somebody at JSO.  You're

10   not issuing a subpoena.  You don't know who's going to testify.

11           How is this going to work?

12           MR. BORISON:  Your Honor, we could issue a subpoena.

13   This is Scott Borison again.  We can issue a subpoena.  Like I

14   said, we have talked to them.  They said that it would not be

15   an issue, but we can secure a subpoena.  We did subpoena --

16           THE COURT:  Who are you talking to?

17           MR. BORISON:  -- the Secret Service agent.

18           THE COURT:  Who are you talking to at JSO?

19           MR. BORISON:  Your Honor, I apologize.  Actually, my

20   co-counsel, Mr. Story, is the one who contacted them.  So

21   verbatim I cannot tell you.

22           THE COURT:  All right.  Mr. Story, what can you tell

23   me?

24           MR. STORY:  Max Story.  Good afternoon, Your Honor.

25           We contacted the records department for the best way

1   to authenticate the records.  And they said they would --

2   someone from the JSO office readily appears -- I'm going to go

3   ahead and issue a subpoena to cover ourselves.

4         But we initially asked them, and they verified, that

5   a call to service was made on this date and that Mr. Scudder's

6   office -- and obviously he's going to testify that he called

7   JSO to come out regarding the identify theft.  So we will go

8   ahead and issue a subpoena.

9         THE COURT:  Mr. Story, that's only half of it,

10  though.  The other half is that you're contending that no

11  police report would be generated by an identify theft claim.

12        Who's going to testify about that?

13        MR. STORY:  That's what we believe the -- JSO told us

14  that's their policy.  So we will, you know, ask -- contact them

15  and follow up with them as to the witness.  And that is why our

16  client is going through the Secret Service as opposed to JSO.

17        THE COURT:  All right.  Well, I'm inclined to allow

18  it because it's an issue in the case.  And I don't think there

19  is a huge surprise on the defendants' side.  In fact, one of

20  the defendants isn't even worrying about it, only one of them

21  is.

22        But I think there's got to be a little meat on the

23  bones here.  And I think you need to identify the actual

24  witness and give that information to the other side, at least.

25  And then they can decide if they want to do anything about it.

1          I mean, they've had as much right to talk to them as

2   you do, so -- but I think -- I think no later than Wednesday --

3   Wednesday at noon you need to give the other side the name of

4   an actual person that's going to testify and their contact

5   information.  All right?

6          MR. STORY:  Yes, Your Honor.  Max Story.

7          THE COURT:  All right.  There's an objection here by,

8   I think, LVNV to Kimberly Hurley testifying.

9          What's the objection?

10         MS. BURNETTE:  Thank you, Your Honor.  Lauren

11  Burnette for LVNV and Resurgent.

12         Ms. Hurley was deposed as a 30(b)(1) witness.  She's

13  listed as a fact witness here.  Ms. Hurley is a Resurgent

14  Capital Services employee who's employed in the Office of

15  General Counsel at Resurgent.  So any personal knowledge she

16  has about Mr. Scudder's accounts or what was done with it was

17  gained in her capacity as a paralegal on part -- on part of the

18  defendants' defense team.

19         And so we raise objections on the basis of

20  attorney/client privilege, to the extent that applies,

21  depending on the question, and work product.

22         This is essentially the same issue that was addressed

23  earlier on when plaintiffs sought to continue or redo the

24  deposition of Kim Hurley, probably a year ago now.

25         THE COURT:  Well, are you saying you made her a

1   30(b)(6) witness?

2         MS. BURNETTE:  No, Your Honor.  She was noticed by

3   plaintiffs as a 30(b)(1), a fact witness.

4         THE COURT:  Oh, okay.

5         MS. BURNETTE:  There was no 30(b)(6) testimony given

6   on behalf of either Resurgent or LVNV.

7         THE COURT:  Well, when she was deposed -- was she

8   asked privileged information when she was deposed?

9         MS. BURNETTE:  Yes, she was.  And it was objected to.

10        THE COURT:  Okay.  All right.  What does the

11  plaintiff say?

12        MR. BORISON:  Your Honor, this is Scott Borison.  The

13  reason we deposed her was she was the one who executed and

14  swore under oath on the interrogatory answers, attesting that

15  she had personal knowledge for -- and information available to

16  her for her -- for the answers to the interrogatories.  And

17  that's why we took her deposition.

18        THE COURT:  All right.  Well, that's a good reason.

19  So why would you have a person you're claiming attorney/client

20  privilege be the one to swear to the interrogatory answers?

21        MS. BURNETTE:  Your Honor, she verified the

22  interrogatories based on her review of records.  I don't think

23  that there would be a problem for plaintiffs asking her if she

24  verified the interrogatory responses, if they were true and

25  correct to the best of her knowledge.  That's all the

1    verifications say.

2           But as far as the how and the mechanics behind how

3    she obtains that personal knowledge, I take the position that

4    that's privileged and plaintiff isn't entitled to ask her that.

5           All that said, Resurgent does have a corporate

6    designee who will appear at trial and testify.  And so if

7    plaintiff wants to ask Resurgent questions about what it did,

8    there will be a Resurgent representative there to answer those

9    questions.

10          THE COURT:  All right.  Well, I think Ms. Hurley is a

11   potential witness.  I think she can be asked certain things.

12   There may be other things she can't be asked.  And so we'll

13   just have to let that play out.  I'm not -- I don't know.  I

14   can't tell until I hear it, so...

15          With regard to Mr. --

16          MS. BURNETTE:  Thank you, Your Honor.

17          THE COURT:  With regard to Mr. Silva, I assume he's

18   not available and not going to be called by anybody.  Is

19   that -- and let me ask the plaintiff.

20          Is that correct?

21          MR. BORISON:  Scott Borison, Your Honor.  Yeah,

22   that's correct.  We had listed him.  As far as we know, there's

23   no way to locate him.

24          THE COURT:  All right.  And the defendants aren't

25   going to call him either, right?

1          MS. PERKINS:  That's correct, Your Honor.  Jenny
2    Perkins.
3          MS. BURNETTE:  That's correct.
4          THE COURT:  All right.  So that's the end of that.
5          All right.  Where is the exhibit list?  Is it part of
6    this?
7          LAW CLERK:  It should be in there, yeah.
8          THE COURT:  Hold on a second.  I'm looking for the
9    exhibit list.  Was it not attached?
10          LAW CLERK:  I thought they attached it.
11          THE COURT:  I'm sorry?
12          LAW CLERK:  It should be attached.
13          MR. BORISON:  Your Honor, this is Scott Borison.
14    They were attached as separate exhibits to the final pretrial
15    statement --
16          THE COURT:  That's what we're looking for.
17          MR. BORISON:  -- in regards to the plaintiff's list.
18          THE COURT:  That's what we're looking for.  We'll get
19    it in a second.
20          While we're getting the list, let me just -- let me
21    just address -- start to address the motions in limine here.
22    So I'm looking at the plaintiffs' motions in limine.
23          So obviously this police report seems to be a little
24    bit of a thing here.  I guess -- I guess my view of it, based
25    on reading the parties' positions -- and, of course, if there's

1    testimony that they didn't generate one to begin with, then

2    that's going to make it a little hard for the defendants to

3    argue they should have had one.

4           But putting that to the side, you know, it seems to

5    me it's relevant in the sense that what happened and -- "did

6    you call the police?

7           "Yes, we did.

8           "Did you -- is there a police report?

9           "No."

10          Or, "Did you provide one to us?

11          "No.

12          "Why didn't you?

13          "Well, I guess because they don't give them to you,"

14    if that's going to be the answer.

15          So it may turn out to be kind of a bunch of nothing,

16    but -- but I do agree with the plaintiffs, unless the

17    defendants want to argue otherwise, there's nothing -- there's

18    nothing saying that a police report is legally required or that

19    it was required to have one to launch an investigation into

20    this matter.

21          So I'm not -- so I guess my position on the police

22    report, at least at the moment, would be that it's okay to talk

23    about it or ask about it.

24          I don't know how that's even going to come out if it

25    wasn't -- if JSO is going to say they don't generate them, I'm

1    not sure how that's going to come out.

2            But I don't think there should be any implication or

3    any statement by anybody that it was required -- legally

4    required in any way.  So that's what I think I think.

5            What do the defendants have to say?

6            MS. PERKINS:  Your Honor, for defendant --

7            MS. BURNETTE:  Your Honor, Lauren Burnette.

8            MS. PERKINS:  Sorry, Lauren.

9            MS. BURNETTE:  Go ahead, Jenny.  No, it's all right.

10           MS. PERKINS:  For defendant SoFi, Jenny Perkins.

11           Defendants were not planning to instruct the jury on

12   what's legally or not legally required.  I think defendants --

13   excuse me, I think defendants are permitted to ask for --

14   defendants are permitted to consider the fact that a request

15   for a police report was disregarded.

16           But to say that a police report is not legally

17   required is not -- is not what's -- not what defendants --

18   that's not -- the defendants are not planning to take a

19   position on what's legally --

20           THE COURT:  Well, did your -- tell me what -- tell me

21   what your position is on the police report, because y'all know

22   this better than I do.

23           Is your position at trial going to be the reason we

24   didn't do more was because we didn't get a police report?  Is

25   that what you're -- is that going to be your position?

1        MS. PERKINS:  That's not our position.  Our position

2   is we did what we did based on the information made available

3   to us.

4        THE COURT:  Okay.  What about -- what about the other

5   defendant?  Are y'all going to say, "We didn't do more than we

6   did because we didn't have a police report?"

7        MS. BURNETTE:  No, Your Honor.  We're not going to

8   say that.

9        THE COURT:  All right.  So I'm not really sure what

10  we're talking about here, then.  Let me ask the plaintiffs.

11        MR. KELLER:  Your Honor, Duran Keller for the

12  plaintiffs.  There was interrogatory responses that indicate

13  otherwise.

14        THE COURT:  All right.  Well, they just told you

15  they're not going to do it, so I'm not -- I'm not going to

16  think they're going to do it.  And we'll just see.  But I don't

17  think I'm going to say there can be no mention of a police

18  report.

19        But, again, if you have testimony from JSO that no

20  police report would have been generated based on the reporting,

21  then that -- that may take care of that.  I don't know.  But

22  we'll see.

23        All right.

24        MR. KELLER:  Duran Keller.  Yes, of course.  Thank

25  you, Judge.

1          THE COURT:  So the settlements of the other

2  lawsuits -- I'm going to say to the defendants, I'm not too

3  inclined to admit settlements of the other parties or lawsuits

4  in the case.

5          I mean, I -- you know, I mean, there are ways to

6  handle the fact that there's certain defendants that are --

7  could be here that aren't.  I mean, we do that all the time.

8          But if I'm understanding that you want to actually

9  put in evidence that the claims were settled or how much was

10  paid or anything like that, I'm not -- I'm not too keen on

11  that, but -- so tell me what we're talking about here with

12  regard to settlements.

13          I'm asking the defendants.

14          MS. PERKINS:  Sure, Your Honor.  This is Jenny

15  Perkins for SoFi.

16          Based on prior Eleventh Circuit law, the defendants

17  are required to satisfy the motion (unintelligible) --

18          THE COURT:  Hold on.  Hold on, ma'am.  We're just not

19  picking you up.

20      (Judge confers with court reporter.)

21          THE COURT:  Are you on your cell phone, ma'am?

22          MS. PERKINS:  No.  I'm on my office line in my

23  office.

24          THE COURT:  All right.  Well, it's better when you --

25  whatever you're doing now, it's better than it was.  Are you --

1    maybe you were on a speaker or something?

2            MS. PERKINS:  I was, Your Honor.

3            THE COURT:  All right.  If you keep talking just like

4    you're talking right now, we'll be fine.

5            Go ahead, please.

6            MS. PERKINS:  Thank you, Your Honor.

7            We -- at least defendant SoFi has no intention of

8    bringing up settlement amounts to the jury.  But under Eleventh

9    Circuit law we are -- we were required to raise the one

10   satisfaction rule in our motion in limine, which is to the

11   extent plaintiff does recover anything from the jury, the FCRA

12   does apply the one satisfaction rule based on Eleventh Circuit

13   case law, the *Westbrook versus Equifax* case we cited, along

14   with the *BUC International Corporation*.

15           THE COURT:  Well, isn't that -- isn't that just --

16           MS. PERKINS:  And it's our position --

17           THE COURT:  Isn't that just another way of saying you

18   can't get a double recovery?

19           MS. PERKINS:  Correct.  But in addition, Your Honor,

20   under the rule, if plaintiff is awarded, say, $25,000, then

21   whatever he receives in his settlement from the three CRAs must

22   be deducted first before defendants who are still remaining in

23   the case -- or if it's just defendant SoFi that is still being

24   held liable is -- is tasked with the amount of recovery for

25   plaintiff.

1          THE COURT:  Yeah, but the jury doesn't have anything

2    to do with that.  That's me post verdict, isn't it?

3          MS. PERKINS:  It is.  And we -- we put it in our --

4    in our motion in limine because recent case law from the Middle

5    District of Florida, *Westbrook versus Equifax*, did say that the

6    appropriate place to raise it is in a motion in limine.  But we

7    have no intention of disclosing to the jury that plaintiff

8    settled for X amount with these three defendants that are no

9    longer in this case.

10          THE COURT:  Well, I think -- I don't think -- I think

11   it's more than that.  I don't want you talking about that they

12   settled at all.  So, you know -- unless something changes my

13   mind, we don't need to do that.  I agree with you.

14          I think I agree with you on the one satisfaction

15   rule, if I understand it, is just saying you can't get a double

16   recovery, so -- all that gets sorted out post verdict, though.

17          Obviously if there's no verdict for the plaintiff,

18   then none of it matters.  And if there is, then we'll figure it

19   out post verdict, right?

20          MS. PERKINS:  Yes, Your Honor.  Understood.

21          THE COURT:  Okay.  All right.  Limited power of

22   attorney, what -- what use -- to what use does the defendant

23   want to make of this limited power of attorney?

24          As I understand it, it was a power of attorney for

25   something completely separate from this.  So what -- what

1  relevance does it have to the case?

2          MS. PERKINS:  Again, Your Honor, this is Jenny

3  Perkins on behalf of SoFi.  Mr. Scudder was deposed and stated

4  multiple times that it was his belief up until discovery

5  started in this case that the loan was secured through the use

6  of a power of attorney.

7          THE COURT:  Yeah.

8          MS. PERKINS:  While Mr. Scudder takes the position

9  that the power of attorney was limited to roof repairs, that's

10  not exactly what it says.

11          It does permit Mr. Silva to take any banking

12  transaction on his behalf.  And we do have evidence in this

13  case, Your Honor, that the reason the loan was able to be

14  funded is because Mr. Silva used the power of attorney to open

15  up a bank account in Mr. Scudder's name where the loan proceeds

16  were distributed.

17          Despite believing and knowing about this power of

18  attorney, Mr. Scudder never disclosed this to any of the

19  defendants that are remaining in this case.

20          He did, however, testify that he told Mr. --

21  Detective Fultz about the existence of a power of attorney.

22  And he thought it was important.

23          Under the FCRA defendants can only do an

24  investigation based on the information that is provided by the

25  plaintiff to the CRAs, which is then forwarded to the

1    furnishers, or the defendants here.  Defendants were not given

2    the complete picture of what actually happened here.

3              THE COURT:  Okay.  I understand what you --

4              MS. PERKINS:  And, therefore --

5              THE COURT:  I understand what you're saying.

6              MS. PERKINS:  Okay.

7              THE COURT:  All right.  What says the plaintiff?

8              MR. KELLER:  Duran Keller for the plaintiff.

9         At the deposition the plaintiff testified speculating

10   as to how the identity -- he could have possibly opened up an

11   account in his name.  So he's required to answer questions in

12   response -- well, to their questions.  But in this case he's

13   guessing.  And this all took place way after all these

14   transactions.

15        The defendants' only purported evidence that this was

16   used -- is the plaintiff guessing how this might have possibly

17   taken place.

18        Aside from that, the defendant wishes to interject

19   this into the trial to confuse the jurors into believing that

20   somehow Mr. Scudder set this up when, as we've articulated, the

21   power of attorney was limited to an insurance situation that

22   had already passed because our guy works on a cruise ship, so

23   he had to have someone do that.

24        Everything that they've stated is trying after the

25   fact to formulate some basis for saying, "Oh, we wish we would

1    have known."

2         Their statement -- their argument today to this Court

3    that under the FCRA the defendants can only do an investigation

4    based on information -- they're all saying that this was

5    required.  And in saying that they're relying upon part of the

6    cause of action which was not a private right of action, which

7    doesn't even say what they're saying it says.

8         1681s-2(a), one of the subparts, says that a

9    consumer -- and this is -- is to provide information pertinent

10   to his basis of the dispute.  He did that.

11        They're now talking about something that has no

12   pertinence to his dispute.  And now they're also saying that

13   that was required; again, the opposite of an investigation on

14   their part.  They're saying, "He should have provided us more."

15        They already had in their own records calls and --

16   and direct disputes.  Then they got indirect disputes.  So

17   they're wrong.  They want to confuse the jury with something

18   that has nothing to do with how this account was opened.

19        THE COURT:  All right.  What I'm going to do is --

20   I -- I haven't actually seen the power of attorney.  I guess

21   this must be one of these exhibits.

22        Do we have it?

23        And do we already -- is it in the record somewhere?

24   I can't remember.  I'm asking --

25        MS. PERKINS:  Your Honor, it should be attached to

1   the summary --

2             THE COURT:  I'm sorry?

3             MS. BURNETTE:  Yes.

4             MS. PERKINS:  It should be attached to defendants'

5   summary judgment motion.

6             THE COURT:  Okay.  Well, we'll take a look at it.

7   And I'll make -- I'm going to reserve on that until I look at

8   it and see.  You know, I -- yeah.  I'll think about it.

9             All right.  Lack of criminal conviction of the

10  identity thief from the plaintiffs.  What do you -- what are

11  you worried about here?

12            MR. KELLER:  We're worried that something that the

13  plaintiff has absolutely no control over, the -- the --

14  bringing the charges and the prosecution of charges against

15  someone who can't be found will be used as a suggestion that

16  maybe Mr. Scudder actually did this and that's why charges

17  aren't brought.

18            The reality is, all of us know that there's a slew of

19  reasons why criminal cases aren't brought, including that the

20  courts are swamped, jurisdictional issues of where to bring the

21  charges against a person who's not even there, and the higher

22  burden of proof.  And they've been trying to create a mini

23  trial -- or even suggest that maybe this was Mr. Scudder when

24  there's literally no evidence of that.

25            THE COURT:  All right.  From the defendants?

1          MS. PERKINS:  Sure, Your Honor.  I'll start, and
2   then --
3          MS. BURNETTE:  Your Honor --
4          MS. PERKINS:  Oh, Ms. Burnette, do you want to --
5          MS. BURNETTE:  No.  You go ahead and start.  And I'll
6   add.  I think we can go forward that way.
7          MS. PERKINS:  Thank you.
8          Jenny Perkins on behalf of defendant SoFi.
9          Mr. Scudder can't have it both ways.  He can't tell
10  the jury that his identity was stolen by an identity thief and
11  then ignore the deposition testimony that he gave, which was
12  that his main focus was getting these loans off of his credit
13  report, as opposed to bringing criminal charges.
14          He also testified multiple times that he did not
15  press charges against Mr. Silva.  There's also record evidence
16  of these two individuals continuing to have communications for
17  three years after this alleged identity theft occurred.
18          The fact that no charges have been brought against
19  Mr. Silva is relevant additionally with respect to his claim
20  that identify theft here occurred.
21          THE COURT:  Well, I'm not sure --
22          MS. PERKINS:  As a plaintiff --
23          THE COURT:  I'm not sure that the fact that no
24  charges were brought is relevant.  I suppose -- if what you're
25  saying is that Mr. Scudder's conduct -- or what he did and what

1    he didn't do -- I mean, that -- that probably is relevant.

2         So, I mean, up until the time -- up until what you

3    just said about the charges -- I don't have any problem with

4    that.  I mean, it seems to me that if -- if there's -- if

5    there's any evidence that Mr. Scudder was trying to get his

6    credit cleared but he didn't really want to pursue and do the

7    necessary to bring -- bring it to a head, then, you know,

8    that's probably fair game, but -- I mean, I think ultimately

9    probably the question is based on the information you had did

10   you do a reasonable investigation.  So I don't know how far

11   afield we get into that.

12        I mean, I don't know -- I don't think it's a trial

13   about whether -- whether his identity was actually stolen.  But

14   to the extent that he, you know, had -- I also don't think it

15   has to be in a vacuum.

16        I mean, I think his conduct and his -- what he did

17   and what he didn't do is probably relevant enough.  But I don't

18   think the fact that charges were or weren't brought -- you

19   know, he didn't have any control over that.

20        I mean, he may have had control about how hard he

21   tried to get charges brought.  And if that's what you want to

22   ask him about, then maybe -- maybe you can do that, but -- so

23   that's what I think about that.

24        All right.  To the defendants, are you planning on

25   blaming the credit bureaus?

1          MS. BURNETTE:  Your Honor, Lauren Burnette for

2     LVNV/Resurgent.  No.

3          THE COURT:  Okay.  All right.  So --

4          MS. PERKINS:  And I would echo that, Your Honor.

5          Jenny Perkins on behalf of SoFi.

6          THE COURT:  All right.  Then we don't have to worry

7     about that.

8          To the plaintiffs -- bona fide error or mistake is an

9     actual affirmative defense under -- under at least some of

10    these statutes, right?  So why -- why -- what are you trying to

11    accomplish with this motion in limine?

12         MR. KELLER:  Yes, Your Honor.  Duran Keller for the

13    plaintiff.

14         Bona fide error is an affirmative defense, something

15    the defendants have to prove.  And there's literally no

16    evidence of any error.

17         The elements of the bona fide error defense include,

18    number one, the existence of an actual error; number two,

19    reasonable procedures that are adapted to avoid that error.

20         Here no one says there's any error, so no bona fide

21    error could possibly belie.  And to the extent they would

22    attempt to make -- the lawyer made argument to the contrary, it

23    would be without any evidence.

24         THE COURT:  Well, I mean, doesn't it -- doesn't it

25    kind of help you?  I mean, if -- I mean, if you're -- if

1    you're -- first of all, an affirmative defense is the

2    defendants' burden.  So they're going to have to come up with

3    evidence that there was an error or mistake and it was bona

4    fide and in good faith.

5         And, I don't know, it seems kind of inconsistent with

6    the rest of the stuff they're saying.  So I don't really -- I'm

7    not really sure -- I guess I -- I don't know how to rule on

8    this without hearing the evidence.

9         I don't know what they're going to say, but I -- I'm

10   not really sure -- I mean, to me -- it's not exactly like this,

11   but it reminds me a little bit of a criminal case where the

12   defense is insanity.  In order to -- in order to assert an

13   insanity defense, you have to -- you have to admit you

14   committed the crime.

15        And it seems like in order to assert a bona fide

16   error or mistake defense, you have to admit you did something

17   wrong.  And that hadn't really seemed to be what they're trying

18   to do.  But I don't know.

19        Let me ask the defendants.  What -- what's this

20   about?

21        MS. BURNETTE:  Thank you, Your Honor.  Lauren

22   Burnette for LVNV Funding and for Resurgent.

23        This is something of -- not a quirk, but sort of a

24   fallout from the FDCPA being drafted the way it is.  The

25   affirmative defense is if it is determined that LVNV or

1 Resurgent violated the FDCPA, then the violation was

2 unintentional and the product of a bona fide error,

3 notwithstanding the procedures that it has in order to maintain

4 such error.

5       Here the allegation essentially is that Resurgent was

6 attempting to collect a debt from somebody that did not owe it.

7 And Resurgent -- you're correct.  No one takes the position

8 that Resurgent or LVNV violated the FDCPA except for plaintiff.

9       But the way that the affirmative defense is applied

10 is even if the conduct is determined to technically violate

11 some provision of the FDCPA or FCCPA, then application of the

12 defense excuses that error.

13       There is no need to admit liability or an equivalent

14 to admitting guilt in order to assert the bona fide error

15 defense.

16       I would also just add that --

17       THE COURT:  So what's the --

18       MS. BURNETTE:  -- defendants have not only produced

19 these policies, but has --

20       THE COURT:  Ma'am -- ma'am, what's your evidence?

21       MS. BURNETTE:  Yes.

22       THE COURT:  What's your evidence going to be?

23       MS. BURNETTE:  Beg your pardon?

24       THE COURT:  What is your evidence going to be?

25       MS. BURNETTE:  Yes, Your Honor.

1    I apologize.  There's like a delay and an echo, so I
2    apologize for being choppy.
3            Resurgent and LVNV's evidence is Resurgent's policies
4    and procedures that were produced during discovery.  It's sworn
5    testimony about what those policies and procedures require and
6    how those policies and procedures were followed here.
7            THE COURT:  All right.  Well, we'll see.
8            MS. BURNETTE:  I mean, that's what the bona fide
9    defense error requires.
10           THE COURT:  I'm not going to rule in limine you can't
11   assert this defense if it's applicable.  We'll see.  I'm just
12   not prepared to grant a motion in limine on it now.  I still am
13   skeptical about it, but we'll see.
14           All right.
15           MS. BURNETTE:  Thank you, Your Honor.
16           THE COURT:  Number 7 is any doctor, therapist, or any
17   expert is required for emotional harms.  And, you know, I've
18   had this a bunch.  And so here's -- here's what we're going to
19   do on that.
20           I agree that Mr. Scudder can get on the stand without
21   any benefit of expert testimony or anything else and talk about
22   his emotional distress and talk about how he has suffered
23   emotional harm as a result of this credit problem.  And the
24   jury can consider that in -- in determining damages.
25           And I don't think there can be any implication or --

1  that -- by the defendants that -- that such expert testimony

2  on -- on the part of the plaintiff is required.  And as I

3  understand it, the defendants don't have any contrary evidence

4  either.

5           But what I think is perfectly fine on

6  cross-examination is -- if the defendants want to say, "You say

7  you've had all this emotional distress.  Have you ever gone to

8  see a doctor about it?  Have you ever gone to see a

9  psychologist about it?  Are you on any medication for it?  Are

10 you" -- whatever the answers are.

11          I think that's perfectly appropriate

12 cross-examination, because I think that goes to the credibility

13 of the statement and how serious it is and whether damages

14 should be awarded and, if so, how much.

15          But I agree with the plaintiffs there's no

16 requirement that there be expert testimony.  But I certainly

17 think on cross the plaintiff can be asked about -- and I don't

18 frankly know the answer to the questions, but I think those --

19 I assume you-all do.  And I think those questions can be asked.

20 So that's how we're going to handle that.

21          I'm tending to think that the fact that the

22 defendants, apparently, did end up correcting the credit

23 file -- I'm tending to think that would be admissible, it would

24 be admissible to cap damages.  It would be admissible.

25          I don't really see how it hurts the plaintiffs that

1  much, because it makes it -- maybe makes it seem like they

2  finally admitted they were wrong, but...

3        So what's the objection by the plaintiff to the -- to

4  saying that the file was corrected late?  Because if I

5  understand it correctly, the file was corrected either at or

6  about the time the lawsuit was filed.

7        Is that right?

8        MR. KELLER:  Your Honor, Duran Keller for the

9  plaintiff.  The concern is not that the file itself has been

10  corrected or updated.  It's that it was not a result of the

11  defendants.  And if they don't claim that it is, they need to

12  make that assertion.

13        I think you are correct, the fact that activity that

14  took place after the fact -- that it took place, I think can

15  still amend, but there needs to be actual evidence that it was,

16  for example, LVNV or SoFi and not the credit bureau itself.

17        THE COURT:  And --

18        MR. KELLER:  And we don't want to have them try to --

19        THE COURT:  Do you have -- do you have reason -- you

20  don't think it was the defendants that caused it?  You think it

21  was somebody else?

22        MR. KELLER:  Correct.  Duran Keller.  Correct.

23  That's what I believe.  And the defendants tried to reassert

24  this into his file.

25        So consistent with -- with your thinking, Your Honor,

1    we believe that their conduct afterwards is also relevant,

2    including the fact that the defendants tried to reinsert this

3    back into his credit file.

4           THE COURT:  All right.  What do the defendants say?

5           MS. BURNETTE:  Your Honor, Lauren Burnette for LVNV

6    and Resurgent.  I think a couple of things.  I'm not sure that

7    they're in order.

8           I'm not familiar with any attempts by LVNV or

9    Resurgent to reinsert a tradeline.  So I'm not sure where

10   Mr. Keller is coming from there.

11          But regardless, I think it's dangerous to suggest

12   that the credit bureau functions and the furnishers' functions

13   can be separated in such a way as to say deletion occurred

14   because of A or B.

15          The reality is that I don't think anybody who is

16   willing to appear at trial to testify can say with certainty

17   whether or not, for example, the tradeline was eliminated by a

18   credit bureau before Resurgent requested deletion of LVNV's

19   tradeline.

20          So I -- it's just not a binary relationship in the --

21   in the context of indirect disputes where the furnishers'

22   obligations are triggered by the credit bureau and the

23   furnisher responds to the credit bureau.  The two are

24   interconnected in that regard.

25          THE COURT:  Boy, I heard you talking, but I didn't

1    understand what you were saying.  I'm not --

2            MS. BURNETTE:  You want me to try again or just stop?

3            THE COURT:  I don't know what that means.  I mean,

4    are you saying -- so let me -- and this is probably just my

5    ignorance of the facts.

6            But is it true that the plaintiff's credit report was

7    eventually corrected or changed to delete this -- this report

8    that was negative based on this loan?

9            Is that true?

10           MS. BURNETTE:  I would say it is true that

11   plaintiff's credit report was changed to request deletion of

12   the tradeline.  And that's sort of where I -- I know it's

13   not -- it's not easy to explain.

14           In plain English, we don't know whether when

15   Resurgent requested deletion of the tradeline whether the

16   credit bureaus were publishing that tradeline still or not.

17           The furnishers don't know what ultimately someone's

18   credit report looks like.  It is entirely possible that a

19   furnisher's furnishing never ends up on a credit report.

20           So the point that I'm making is that we don't know

21   when Resurgent requested deletion of the tradeline, which it

22   did, whether this tradeline disappeared from Mr. Scudder's

23   credit report because of that, or whether it had already come

24   off the credit report because of some action of a credit

25   repair -- or a credit bureau.

```
 1              I probably made it worse, didn't I?
 2              THE COURT:  All right.  Well, I don't know.
 3              So from the plaintiff's standpoint -- are you
 4    suggesting -- you seem to be suggesting there's going to be
 5    evidence that these defendants tried to go back and have this
 6    derogatory information reinserted into the credit report.
 7              Did I did understand you to say that correctly?
 8              MR. KELLER:  Yes, as to SoFi, Your Honor.
 9              THE COURT:  Okay.
10              MR. KELLER:  Duran Keller.  Excuse me.
11              THE COURT:  All right.  And so --
12              MS. PERKINS:  May I respond to that, Your Honor, on
13    behalf of SoFi?
14              THE COURT:  Of course.  Yeah.
15              MS. PERKINS:  Thank you, Your Honor.
16              The reinsertion of the tradeline on -- the SoFi
17    tradeline, I should say, on plaintiff's account, that happened
18    post discovery.  And, additionally, plaintiff filed a separate
19    lawsuit about that reinsertion.  It was actually put before
20    Your Honor.
21              We filed an answer.  And plaintiff elected to dismiss
22    that case without prejudice.  And that case has been dismissed.
23    Plaintiff recognized that the reinsertion had nothing to do and
24    did not relate back to the complaint in this action by the fact
25    that they filed a separate lawsuit about it.
```

1    Additionally, there was no discovery actually

2  completed in this case about the reinsertion, why it was

3  reinserted, what happened, how long it was reinserted for,

4  because this all happened post discovery in this case.

5    THE COURT:  Well, why -- why did you do it?

6    MS. PERKINS:  I'm sorry, Your Honor?

7    THE COURT:  Why did your company do it?

8    MS. PERKINS:  I don't know if my -- sitting here

9  today, I don't know if my company did.  I don't know if it was

10  a CRA mistake.  Plaintiff had his own settlement agreements

11  with the CRAs that I'm sure had to do with furnishing.

12    But my point is that this is all post discovery in

13  this case.  And plaintiff recognized that and decided to bring

14  a separate lawsuit, and also voluntarily dismissed that case on

15  his own accord.

16    THE COURT:  All right.

17    MS. PERKINS:  He can't shoehorn that case into this

18  case.

19    THE COURT:  All right.  That's a fair point.

20    What does the plaintiff say?

21    MR. KELLER:  Thank you, Your Honor.  I'm going to

22  back up to what the first defendant said.

23    All they really said is, "Judge, we don't have any

24  evidence of correcting any file."

25    They're not going to submit any person with competent

1  knowledge to say they corrected anything, which is exactly the

2  point.

3       As to the claim that, "Well, this occurred and there

4  wasn't discovery," I don't know how that matters at all.  I

5  think the operative point to what the last defendant was

6  arguing is that plaintiff dismissed his other claim without

7  prejudice, but the claim that this exact same loan was

8  reinserted and somehow didn't have anything to do with this

9  case, which is about the credit reporting of that loan, makes

10  no sense.

11       So the point of our motion in limine was to say,

12  "Look, Judge, they can't tell the" -- "they can't tell the jury

13  that they corrected anything because they have no evidence that

14  they did it."

15       To the contrary, SoFi tried to put it back on.  And

16  we agree with you, Your Honor, that evidence of what happened

17  after the fact is relevant.  They just don't have any evidence.

18       And the whole, "Well, this happened post discovery,"

19  we gave them this document that shows the reinsertion.  They

20  don't get to hide -- our position, that the defendants don't

21  get to hide behind their own unwillingness to provide why they

22  tried to reinsert it to say, you know, we don't get to bring it

23  up.  Our whole motion in limine is about a lack of evidence on

24  their part.

25       THE COURT:  Okay.

1          MS. BURNETTE:  Your Honor, may I clarify one point?

2          THE COURT:  Yeah.  Who is this?

3          MS. BURNETTE:  This is Lauren Burnette for LVNV and

4    Resurgent.  I'm glad Mr. Keller put what he said the way he did

5    because it's a perfect lead-in to the point that I was trying

6    to make.

7          Resurgent does, to the contrary of what he said, have

8    evidence that it requested deletion of the tradeline.  What it

9    does not have evidence of is what the credit bureaus had done

10   before or in response to Resurgent's request or afterwards.  So

11   the point that Resurgent is making is that it does have

12   evidence of its own conduct.

13         THE COURT:  Well, why --

14         MS. BURNETTE:  But what appears on a credit report is

15   not the product of Resurgent's conduct alone.

16         THE COURT:  Ma'am, why wouldn't you just -- I don't

17   get it.

18         Why wouldn't you just assume they did it because you

19   asked them to?  Why are you being so fancy about that?  I mean,

20   what -- I mean --

21         MS. BURNETTE:  Because -- I apologize.  I didn't mean

22   to interrupt you.

23         THE COURT:  I guess I don't -- how does it benefit

24   you by saying, "We asked them to do it, but we don't know if

25   they did it because we asked them to"?  How does that help you?

1          MS. BURNETTE:  The point that I'm making, Your Honor,

2     is one of personal knowledge, because that's what we had been

3     discussing, was what each defendant has personal knowledge of,

4     as far as actions go.

5          And it was suggested by Mr. Keller that Resurgent

6     does not have evidence of its own conduct with respect to

7     requesting deletion of the tradeline and it does.  And it does.

8          The reality is that Mr. Scudder settled with the

9     credit bureaus very quickly.  And we don't know what those

10    settlements entailed.

11         So the truth is I don't know when the tradeline came

12    off his credit report.  We don't know when the tradeline came

13    off his credit report because it is a piece of the process that

14    Resurgent has no control over.  And it does not see the end

15    product.  Furnishers do not receive credit reports the way that

16    consumers do.

17         THE COURT:  Okay.  All right.  Well, here's what I

18    think.  I don't know, it seems to me that -- that this -- this

19    is all potentially relevant and it just is going to depend on

20    what the evidence is.

21         I mean, I don't know -- I don't think -- if somebody

22    is trying to -- I don't think this will happen.  But if one of

23    the defendants is trying to claim that they cleaned this thing

24    up at the same time they're asking the credit reporting agency

25    to -- to put it back on -- put the derogatory information back

1    on, I mean, that seems a little hard to think that a defendant

2    would lead with their chin like that.  But if they do, I guess

3    they do.

4            And in regards to the deletion, I guess, if y'all

5    want to put in evidence -- the defendants want to put in

6    evidence that you asked to have it deleted, then you did.  And

7    so, you know, good for you.

8            And, I don't know, I -- I guess I'm really going to

9    have to hear the evidence, because -- but I'm not inclined --

10   if the question is is what happened later on after the

11   complaints were made and so forth, what actually happened, who

12   asked who to do what, it seems kind of relevant to me.  And --

13   and I think it could be relevant to damages, too.

14           So I'm not inclined to grant an in limine on this.

15   I'm inclined to hear evidence.  And if somebody -- if somebody

16   is taking a position that has no evidentiary support, that will

17   become clear pretty quickly.

18           And if somebody makes a statement -- an opening

19   statement that they can't back up, then that will become clear

20   pretty quickly, too.  So -- so I -- I hear you.  And I think

21   that's how we're going to handle that.

22           All right.  I'm not going to allow --

23           MR. KELLER:  Thank you, Your Honor.

24           THE COURT:  I'm not going to allow anybody to call

25   the dispute frivolous.  I'm not going to allow anybody to argue

1    that Mr. Silva's non-appearance is anybody else's fault in the

2    absence of any evidence to the contrary.

3            I don't know -- the plaintiffs in No. 11 are

4    talking -- and we're not -- by the way, in No. 12 we're not

5    going to talk about attorneys' fees and costs in the trial.

6    We're just not, so...

7            Number 11 I don't understand:  Alleged investigations

8    performed by defendants, employees, or agencies which were not

9    disclosed during discovery.

10           I don't know what that means, Plaintiffs.

11           MR. KELLER:  Hi, Judge.  Duran Keller.

12           Yeah.  This -- this is a matter of lack of evidence.

13   We deposed the purported dispute agents, who were supposed to

14   do the investigation.  And all we're saying is that the

15   defendants don't get to come in with someone who lacks personal

16   knowledge and try to tell all of us, "Hey, here's what we did,"

17   when these people are not percipient witnesses.  They weren't

18   there.  And they're just not competent to testify.

19           If the -- similar to the issue that we raised

20   earlier, Your Honor, it was an issue about lack of evidence.

21   And I agree with how you ruled already.

22           THE COURT:  All right.  Well, whatever I said before

23   I guess is what I'm saying now.  But I -- you know, again, if

24   there's lack of evidence, there's lack of evidence.  And either

25   that means nobody will try to assert something that they can't

1   prove or it will mean they will try to assert something that

2   they can't prove and then that will become clear pretty

3   quickly.

4           And I will tell you truly that if somebody gets up in

5   opening or says something in front of the jury that they don't

6   have any evidence for, that's going to be a problem.

7           All right.

8           MS. PERKINS:  Your Honor, this is Jenny Perkins.

9           If I may just revisit something just for

10  clarification, because I think it was a little bit nuanced with

11  respect to SoFi.

12          THE COURT:  Yes.

13          MS. PERKINS:  It's my understanding that plaintiff is

14  going to try to bring in the fact that the SoFi loan was

15  reinserted on the tradeline after discovery closed in this

16  case, even though he decided to bring a lawsuit about that

17  specific point, not disclose any of those documents that he

18  produced -- or that he attached in that lawsuit, or signal to

19  SoFi that he was going to make the -- that part of this

20  lawsuit, then voluntarily withdraw that lawsuit on his own and

21  then a year later try to bring that claim into this lawsuit.

22          THE COURT:  Well --

23          MS. PERKINS:  I think that's fundamentally unfair and

24  prejudicial.

25          THE COURT:  I guess I'm asking you, ma'am:  Why did

```
 1   your company do it?
 2          MS. PERKINS:  We didn't get into discovery, Your
 3   Honor, to figure out what was done there.  They just made an
 4   assertion.  They filed a complaint about it, and then for
 5   whatever reason they decided not to pursue discovery in that
 6   case.  It was their case.  And then they decided to dismiss the
 7   lawsuit.
 8          THE COURT:  All right.
 9          MS. PERKINS:  And now they're trying to shoehorn that
10   in to this lawsuit.  They can't play those games, Your Honor.
11          THE COURT:  Well, I don't know if they can or they
12   can't, but...
13          Are you telling me that we're in this suit about this
14   loan and while this suit is going on and while you're in
15   discovery and then discovery closes, you're getting ready to go
16   to trial in this case -- I don't know when this happened --
17   when did it happen in point of time, ma'am, the reinsertion?
18          MS. PERKINS:  I believe plaintiff claims it happened
19   in July or August of 2021 --
20          THE COURT:  And --
21          MS. PERKINS:  -- or 2022.  Excuse me.  2022.
22          THE COURT:  And, ma'am, you say the plaintiff claims.
23   But you represent your client.  You would know whether it
24   happened or not, wouldn't you?
25          MS. PERKINS:  I would, Your Honor.
```

1        But as Ms. Burnette was explaining, there are a lot

2   of different parties involved in what ultimately appears on a

3   credit report.

4        So what the exact cause of putting that -- or

5   reputting that on the report was not explored in this case

6   because discovery was over.  And plaintiff filed a whole

7   'nother federal lawsuit about it and did not engage in any

8   discovery and decided to withdraw the lawsuit.

9        THE COURT:  You don't think -- you don't think that

10  while you're in a lawsuit about this loan and about the credit

11  report on the loan, and why you -- and now you're going to go

12  to trial in that case, you don't think the fact that your

13  client tried to reinsert the derogatory information which had

14  apparently been deleted previously -- you don't think that's

15  relevant?

16        MS. PERKINS:  It would be relevant if they gave us

17  fair notice that they were planning to use it in this lawsuit.

18  But because all of this happened post discovery in this

19  lawsuit, and the first time I'm hearing that they're planning

20  to use this in their exhibits that they -- their exhibit list,

21  that is prejudicial and unfair surprise.

22        I'm talking about notice, Your Honor, respectfully.

23        THE COURT:  I understand what you're talking about.

24        MS. PERKINS:  And none of those documents were

25  produced in this case, or told that -- or given us notice that

1    they were going to use in this case.

2           I have no idea why they decided to withdraw that

3    other lawsuit.  But it was -- certainly was not on any

4    condition that they would be bringing in things from that

5    lawsuit into this case.  And they didn't give us fair notice

6    that they were planning to bring those claims in this lawsuit.

7           THE COURT:  All right.  What does the plaintiff say

8    about that notice?

9           MR. KELLER:  Would you like a response from the

10   plaintiff, Your Honor?

11          THE COURT:  Yeah.  Sure.

12          MR. KELLER:  Duran Keller for the plaintiff.

13          Let's call this what it is.  The defendant here just

14   said there was no discovery as though they would need to depose

15   themselves, I guess.

16          They know what they did.  And they're saying the fact

17   that the discovery deadline in this case had already passed

18   meant that whatever they did to my client is not going to be a

19   part of the trial.

20          So if they send somebody to break his leg for

21   bringing this lawsuit, they can't bring that out.  And this

22   whole thing about, "Well, he dismissed that case again with

23   prejudice" -- "without prejudice," excuse me, it doesn't have

24   anything to do with whether this information is relevant to

25   what they did.

1        This is going to be critical to showing their system

2    is broken.  There's no action of review.  And they've submitted

3    nothing -- when they say that they've not been put on notice,

4    they are wrong.  We've exchanged emails about this.

5        They were literally sued.  And they're saying, "I

6    don't know.  Did we need to put the caption for this case all

7    onto that document that we emailed them?"

8        The argument does not make sense.  And then they told

9    you, again, as my co-counsel --

10        THE COURT:  Let me -- let me ask you this.  If it's

11    so obvious that this is part of this case, why did you feel the

12    need to file a separate lawsuit in the first place?

13        MR. KELLER:  Well, I can't speak to the motive of the

14    second lawsuit.  But I think the intent -- I know the intent

15    was to file suit and consolidate.  The problem is it would have

16    potentially jeopardized our trial date.  And we went, "You know

17    what, it comes in in another faction anyway."

18        And, again, that was -- that was --

19        THE COURT:  Well, I'm not sure -- I'm not sure that

20    answers my question.  If it's so obvious that this is part of

21    this case, why did you feel it necessary to file a completely

22    different lawsuit about the same loan and about conduct which

23    postdated the close of discovery in this case if you thought it

24    was part of this case?

25        MR. KELLER:  I think we found out that it was --

1    that -- we thought that this issue might have been something

2    new, a separate piece of data, and through this -- through

3    going back and forth, we found out that this appeared to be a

4    late response to one of his old disputes that they didn't

5    respond to.

6            Again, as they pointed out to you, we didn't get any

7    discovery on this item, so we didn't know how this came about.

8    So I --

9            THE COURT:  Well, I --

10           MR. KELLER:  -- I don't have a better answer for you.

11           THE COURT:  Well, your answer to me is about as good

12   as the defendants' answer is to me.  Neither one of them is

13   completely satisfactory.

14           MR. KELLER:  I should have bitten my tongue, then.

15           THE COURT:  Neither answer from you or from the

16   defendants is completely satisfactory, I don't think.  And, you

17   know, I don't know.  I guess I'll have to think about it.

18           But it is not -- on one hand I think, well, if, for

19   whatever reason, SoFi -- after the credit had been cleaned up

20   finally, they decided to go back and ask the derogatory

21   information to be reinserted, that sounds like something a jury

22   might want to know about, and potentially could be relevant to

23   punitive damages.

24           On the other hand, if it was so obvious it was part

25   of this case all along, why did the plaintiffs feel the need to

1    file a whole separate lawsuit about it when they could have

2    just included it in this suit, asked to amend the complaint, or

3    do whatever they needed to do to make sure it was part of this

4    lawsuit?

5           And so I'm not sure I -- I'm happy particularly with

6    either one of those positions.  And it seems like it's a fairly

7    important point in the case.  And I guess I'm just going to

8    have to think about it.  I don't know what I'm going to do.

9           Part of it might be I might have to take a proffer to

10   see what the actual evidence is.  I don't know.  But -- I'm

11   certainly not ruling out that I would admit it, but I'm

12   certainly not ready to admit it yet.  And so I think that's

13   about as good as I can do right now.  I mean, I didn't know

14   this issue was even an issue, I don't think.

15          I'm not sure this -- if it was, it wasn't in my mind.

16   I read all these papers.  But I don't -- I don't remember

17   focusing on this issue.  So I guess I'll -- I have to think

18   about that one.

19          All right.  We're going to need to move this thing

20   along here.  I'm trying to -- I wanted to get as much of this

21   in limine stuff done as I could so that I could -- we -- y'all

22   would get rulings from me.  And I think I've given rulings on

23   most of it.

24          I'm going to look at the defendants' -- I think that

25   takes care of the plaintiffs.  I'm going to look at the

1    defendants now.  And somebody did give me this limited power of

2    attorney.  I'll take a look at it in a minute.  So on the

3    defendants' motion in limine -- let me get my notes here.

4         All right.  So there's a motion by SoFi about

5    evidence of credit disputes that date back to 2018, the direct

6    disputes and so forth.  I have to confess, it was a little hard

7    for me to follow.

8         What does SoFi have to say about this?

9         MS. PERKINS:  Your Honor, to the extent plaintiffs

10   intend to make an argument that SoFi violated the FCRA with

11   respect to its investigation of plaintiff's 2018 dispute, it's

12   our position that that should not come in because that is

13   barred by the statute of limitations, and it was not -- never

14   really made part of this case.

15        The case was focused on the -- on the indirect

16   disputes that were -- were sent to the credit reporting

17   agencies in the spring of 2021.

18        So that's our position.  There's a two-year statute

19   of limitations with respect to the FCRA.  And this lawsuit was

20   filed in the summer of 2021.

21        I can separately address the direct disputes if Your

22   Honor would like me to.

23        THE COURT:  Go ahead.

24        MS. PERKINS:  With respect to the direct disputes,

25   it's just our position, which is echoed by the Eleventh

1   Circuit, that what SoFi did in response to those direct

2   disputes has no bearing on its liability under the FCRA

3   1681s-2(b) upon receipt of the indirect disputes in 2021.

4   Those prior investigations of direct disputes did not trigger

5   SoFi's obligations under the FCRA.

6          So plaintiff -- it is our position that plaintiff

7   can't make the argument or state that defendants' investigation

8   in 2018 of the direct disputes has a bearing on what the jury

9   is there to decide, which is the reasonableness of their

10  investigations in 2021.

11         THE COURT:  All right.  What does the plaintiff say?

12         MR. KELLER:  Duran Keller for the plaintiff.

13         Your Honor, this is about -- this is about showing

14  that they had knowledge.  And it's relevant to reasonableness.

15  They just spit off to you statute of limitations.  And they

16  want to distinguish between the FCRA and something else.

17         But the reality is they were required to conduct an

18  investigation, consider what's in their own records, the

19  information that they already had.  And they -- they want to

20  hide the fact that they already knew all about this from the

21  jury.

22         Their investigation was deficient and unreasonable

23  because they already knew all of this.  And they're now trying

24  to just hide it.

25         We're not fighting that we need to reinvigorate a

1   claim that was brought past the statute of limitations.  It's

2   not about that.  But they don't get to hide that they had

3   notice of something and act like they just didn't know what was

4   going on by withholding something from the jury.  That is not a

5   statute of limitations issue.  It is a notice issue.  It's a

6   "you had this in your own records and you still came up with

7   the wrong result."

8            THE COURT:  All right.  Response?

9            MS. PERKINS:  The response is that I agree that what

10  was in our records was in our records.  And you certainly can't

11  erase what was in the records.

12           The only -- the only point we're taking here that we

13  want to make clear is that plaintiff cannot argue to the jury

14  that it violated the FCRA in 2018 upon its receipt of an

15  indirect dispute, because that indirect dispute is time-barred

16  by the statute of limitations.

17           And plaintiff can also not try to confuse the jury

18  into thinking that the direct disputes in 2018 were -- is part

19  of their FCRA claims.

20           THE COURT:  All right.  I'm not -- I'm not --

21           MR. BORISON:  Your Honor, this is Scott Borison.  I

22  just --

23           THE COURT:  No.  No, sir.  I'm not -- I'm not

24  prepared to grant a motion in limine on this basis.  I'm trying

25  to follow what's being said.  It's a little bit hard for me to

1    follow.  But I think I'm just going to have to let this play

2    out.

3              And if you want to make an objection at trial to

4    certain questions, I'll consider it at the time in context.  I

5    just can't -- I can't quite -- in order for me to grant a

6    motion in limine, I have to be pretty darn sure that something

7    can't come in.  And I just can't quite tell based on this.

8              And so if you -- if you get to a point in the trial

9    where you feel like it's going to come up and you think you can

10   make me understand it a little bit better at the point, I'll

11   listen outside the presence of the jury, but I'm not prepared

12   to grant a motion in limine on that matter at this time.

13             I'm also looking at SoFi's motion in limine regarding

14   the circular.  And I assume the circular has to do with the

15   police report.  I'm just going to hold off on that.

16             I think this police report could end up being less of

17   an issue than everybody made it.  If it becomes an issue and if

18   somebody tries to say it was required or something, then I

19   might revisit the circular.  But for right now I'm not going to

20   allow the circular.

21             If you really feel like you need it or you have a

22   basis to get it in, I'll hear your arguments outside the

23   presence of the jury at the appropriate time.

24             With respect to Mr. Hendricks's testimony, I feel

25   like I've already said in -- both in my *Daubert* ruling and

1   earlier today what I'm going to let Hendricks do.  And if he

2   starts to go beyond what I think he can do, then -- then I

3   won't let him -- I won't let him do it.

4        Evidence that was never disclosed -- we've already

5   talked about the JSO corporate representative.

6        The two fact witnesses referenced are Betancur and

7   Dixon.  I don't know who they are or what they're going to

8   testify to.  So I'll ask the plaintiffs about that right now.

9        MR. KELLER:  I didn't hear that very well.  I'm

10  sorry.  I didn't get those names.

11        THE COURT:  Mr. Betancur, B-e-t-a-n-c-u-r, and

12  Mr. Dixon.

13        Hello?

14        MR. KELLER:  Sorry, Your Honor.  I believe we're

15  talking about them trying to preclude our client's husband.

16  And I'm not sure how they could possibly preclude that he's a

17  percipient witness that was around when this stuff took place.

18        THE COURT:  And who -- which one is he?

19        MR. KELLER:  I'm confirming the name with co-counsel.

20        Max?

21        MR. STORY:  Yes.  Max Story.  Betancur is Bruce's

22  husband.

23        THE COURT:  And who is Dixon?

24        MR. BORISON:  Your Honor, this is Scott Borison.  He

25  is from Bank of America.  It's unlikely he'll be called.  He

1    (unintelligible) subpoena power.

2         THE COURT:  All right.  Well, I'm not going to worry

3    about him, then.

4         So what is the objection to the defendant's husband

5    being called?

6         MS. PERKINS:  Our objection, Your Honor, is that he

7    was disclosed on the eve of the close of discovery --

8         THE COURT:  On the eve --

9         MS. PERKINS:  -- and there was no proffer for what

10   information he has.

11        THE COURT:  Yeah.  What is -- that's a good question.

12        What information does he have?

13        I'm asking the plaintiffs.

14        MR. KELLER:  You want me to take this?  Duran Keller.

15        I can tell you that Mr. Scudder's husband was around

16   when -- when Mr. Scudder was going through finding out that he

17   was a victim of identify theft, trying to get his credit fixed.

18        So he's a percipient witness to the effects on

19   Mr. Scudder himself.  He's going to testify concerning the

20   effects on Mr. Scudder, on his emotional stress, on his -- he's

21   a corroborating witness, Your Honor.

22        THE COURT:  All right.  Well, I don't know about the

23   disclosure.  It seems like a relatively routine witness.  But

24   if you -- if the defendants really are concerned about him and

25   you want to take a quick deposition this week, I'll let you do

1   that and you can work it out with the plaintiffs.

2          My guess is you decide -- you'll decide you don't

3   need to do that.  And we'll go from there.  But if you want to

4   take his deposition, have at it.

5          All right.

6          MS. PERKINS:  Thank you, Your Honor.

7          THE COURT:  Evidence of credit score changes, credit

8   harms, and speculative damages of emotional distress, I'm going

9   to -- I'm going to allow the plaintiff to testify about his

10  damages.  And if there's objectionable questions or testimony,

11  it can be made at that time.

12         Evidence of SoFi's financial condition, what I

13  typically do in these cases is I don't allow evidence of

14  financial condition until I find an evidentiary basis for

15  punitive damages.

16         Is there a -- an actual net worth number in this case

17  for SoFi that's been produced?

18         I'm asking SoFi.

19         MS. PERKINS:  There's been not -- there's been no net

20  worth discovery requested from SoFi.

21         THE COURT:  So then what's your motion in limine

22  about?

23         MS. PERKINS:  I just -- I don't know what plaintiff

24  is planning to do.  I don't know if he's trying to put in

25  numbers from public filings.

1      THE COURT:  Well, he wouldn't be doing that without

2  listing them as exhibits or without some evidentiary

3  foundation.  And if they don't have any, then I guess that's

4  it.

5      I mean, so let me ask the plaintiffs.  Are you

6  intending -- you don't have any evidence of financial

7  condition, do you?

8      MR. KELLER:  Duran Keller for the plaintiff.

9      I agree with you, Your Honor, we have to have proper

10  foundation in order to get something in.  I do believe that

11  LVNV's financial circumstance is not just limited to net worth

12  circulating from their own admissions before.  And I can't

13  point to that documentation right now, so -- I realize we'll

14  have to be able to do it.

15      But the financial condition and the resources that

16  are available to the defendants go directly towards the

17  reasonableness, the cost-benefit analysis of conducting a

18  fulsome investigation.

19      And, remember, under the FCRA, it's about negligence.

20  And to the extent you get punitive damages, it's just a further

21  form of negligence, negligence to the point of recklessness.

22      So we submit that the financial conditions and the

23  resources available to the defendant is relevant to both the

24  prima facie case, negligence, and the more -- the higher degree

25  of negligence.

1          THE COURT:  Well, even -- even if I accept that as

2    true, if you don't have any evidence of it, you -- you can't

3    just make it up out of thin air.  And now you're telling me you

4    can't put your hands on the evidence of it.

5          So I'm going to grant the motion in limine regarding

6    financial condition, but I'll do so with the understanding that

7    if the plaintiffs feel like they have a basis to do so and they

8    have evidence to support it -- I mean, I haven't looked at all

9    your exhibits.

10          But if you have an evidentiary basis to support

11    evidence concerning financial condition, you can tender it

12    outside of the presence of the jury.  I'll take a look at it.

13    I'll decide whether it's relevant.  I'll decide whether it's

14    admissible.  And we'll go from there.

15          So that's my ruling on financial condition.

16          All right.  With respect to the motions in limine by

17    the other set of defendants, LVNV and Resurgent, the motion in

18    limine with regard to Hendricks I've already addressed.

19          The motion with respect to exclude testimony that,

20    for example, they ignored Mr. Scudder's pleas or simply didn't

21    care, I mean, that sounds more like closing argument after a --

22    after evidence has been adduced.  And I think it may be

23    permissible argument.  I don't think it's necessarily evidence,

24    but it's argument, maybe.

25          I don't think we're going to be talking about zombie

1    debts or junk debt buyers or pennies on the dollar, but we may

2    be talking about ignoring pleas and simply didn't care.  So I

3    don't know what else might come up, but -- but that's what I

4    think about that.

5         I don't think we'll be talking about other lawsuits

6    against LVNV or Resurgent unless I hear something that I don't

7    know.

8         And the one satisfaction rule I've already discussed.

9    That will -- that doesn't have to be at the trial.  That will

10   be post verdict.  So we don't have to talk about that.

11        All right.  And the only other thing I wanted to

12   do -- and we're going to start to wrap this up -- is I wanted

13   to look at your exhibit lists and see if there's anything

14   that -- I see all kinds of objections, but that doesn't bother

15   me.

16        You know, you try to put in a document and there's an

17   objection, I'll rule on it.  There's no way for me to go

18   through all this stuff now.

19        And so if you think there's some particular area that

20   you need to bring to my attention, just bring it to my

21   attention before the witness testifies and I'll -- I'll give

22   you a ruling.

23        (Judge confers with courtroom deputy.)

24        THE COURT:  All right.  I'm going to look at this

25   limited power of attorney for a minute.

1           All right.  I'm going to grant the motion in limine

2    on the limited power of attorney.  This doesn't seem like it

3    has a thing to do with anything.

4           I will do so without prejudice.  If the defendants

5    want to come back at me in context, I'll consider it at that

6    time.  But at the moment my decision would be to exclude the

7    limited power of attorney.  And I...

8           Stand by.  I'm just -- I'm trying to get -- I have a

9    sheet I use to make sure I've covered everything I wanted to

10   cover.  And then I'll hear from you-all and see if there's

11   anything else you want to talk about.

12          Probably in 20/20 hindsight I should have made you

13   come in person, but I didn't realize we were going to be

14   talking about -- I think there were 20 motions in limine and

15   all the rest of this.  But I think we got through most of it.

16          All right.  Of course, Judge Barksdale will be

17   working with you to set up the jury selection.  And, as I said,

18   it will be 10 o'clock on Tuesday, since we can't do it Monday

19   afternoon.  And then we'll go right -- roll right into the

20   trial.

21          What about deposition designations?  When did I give

22   you to do that?  I'm asking the plaintiff.

23          MR. BORISON:  Scott Borison, Your Honor.  Actually,

24   it's due today.

25          THE COURT:  All right.  And are you going to have a

1   lot, or not?

2          MR. BORISON:  For some, yes, but --

3          THE COURT:  All right.

4          MR. BORISON:  -- two or three of them are going to be

5   pretty short.

6          THE COURT:  All right.  I want to make sure that

7   you're not going to read depositions of people that are going

8   to be called anyway.  And so I want you to talk to the

9   defendants.

10          And on the defendants, if you're going to call

11  somebody anyway, then you need to tell the plaintiffs so we

12  don't have to be reading a deposition and you can just ask them

13  the questions at trial.  And, of course, you can impeach them

14  with their answers if they...

15          But if you're going to call them and they're outside

16  of the plaintiff's ability to bring in, then I guess we'll have

17  to read the depositions, but -- now, is this video?  Or is it

18  just back-and-forth?

19          MR. BORISON:  Scott Borison, Your Honor.  It's

20  back-and-forth.  And I think the people we have identified --

21  it's my understanding these are people that are beyond the

22  subpoena power.  And the defendants have told us they're not

23  going to bring them for trial.

24          THE COURT:  Okay.  That's fine.

25          Then -- and so the defendants -- I probably gave you

1  a -- a date to cross-designate.  Are y'all going to have any of

2  your own?  Or are you just cross-designating the plaintiffs?

3        MS. PERKINS:  Your Honor, this is Jenny Perkins for

4  SoFi.  You asked us to wait to see what the plaintiff

5  designated before deciding whether to give us a date to

6  cross-designate.

7        THE COURT:  Okay.  Right.  But are you going to have

8  any of your own depositions, or -- that you're wanting to read,

9  other than cross-designations?

10        MS. PERKINS:  SoFi is not planning to designate any

11  affirmative deposition testimony.

12        THE COURT:  Okay.  All right.

13        MS. BURNETTE:  Neither is LVNV.

14        MR. KELLER:  Duran Keller, Your Honor.

15        THE COURT:  I'm sorry?

16        MR. KELLER:  I'm sorry.  Duran --

17        THE COURT:  I think --

18        MR. KELLER:  I just wanted to add -- Duran Keller --

19  I do believe we have one video.  The others are all depositions

20  that will have to be read in.  I just want to make that

21  correction.

22        THE COURT:  All right.  Well, if you've got video, I

23  want it tightly edited.  I don't want somebody sitting there

24  looking for papers for five minutes.  It needs to be tightly

25  edited.

1           And you need to include the cross-designations as

2    well, so that we're not -- you know, we're not goofing around

3    with it.  So -- just make sure -- you know, I am not going to

4    just sit here and watch somebody look at papers for five

5    minutes in a deposition.  So you better be advised.  All right?

6           All right.  So -- and you need to show it, obviously,

7    to the other side, or give them a copy of it, so they know

8    exactly what it's going to be.  And if there's

9    cross-designations, those need to be included.

10          Okay.  And I have to also remind you to make sure you

11   tag your exhibits and bring them with you to -- to the trial.

12   You can have them loaded up, too, and -- to be able to display

13   to the jury and so forth, but obviously you need a paper copy

14   that will be used at trial.  Eventually at the end of the trial

15   we digitize them anyway, or we require you to, but...

16          So it's fine to have them in a way that you want them

17   published, like, on the big screen and so forth.  You can have

18   it loaded up.  But you still have to have real paper exhibits

19   or other exhibits that are marked that you turn in to the

20   clerk.  And if you can -- if you can give me and my law clerk a

21   copy of them, that would be great.  And they have to be tagged.

22          Anything -- any detail on that you can talk to

23   Mr. Luksha about.  And if you want to come in and -- our

24   technology is a little bit old, but it still gets the job done,

25   except for telephone hearings, and -- but if you want to come

1    in and get checked out on it, you're welcome to do so.

2    Mr. Luksha will be happy to arrange that with you.

3              MS. PERKINS:  Thank you, Your Honor.

4              THE COURT:  Anything else?

5              Anything else, Tim?

6              All right.  That's all we've got.

7              Does the plaintiff have any questions or other

8    concerns?  Because this will be the last time that we'll likely

9    talk.

10             If we have to, I could probably meet with you at

11   9 o'clock on Tuesday to clear up any other last-minute issues

12   before Judge Barksdale starts her jury selection at 10:00.  But

13   otherwise, this will be the last time we'll meet.

14             I've got to think about that one issue that I -- that

15   I said I would think about, the -- the post -- what are we

16   calling it, the post-discovery correction, or whatever?  I'll

17   take a look at that.  Yeah.  So --

18             MS. PERKINS:  Your Honor, may we submit a -- a short

19   supplemental brief on that issue?

20             THE COURT:  Yeah.  I can tell you're -- I can tell

21   you're worried about it.  So, yeah, of course.  I mean, I --

22   you know, I want to be fair.  I don't want to be unfair to you.

23   And I haven't made any decisions.  I -- as I said, I'm not

24   perfectly agreeing with either one of you.

25             It seems like you both might be a little bit right.

1  But obviously we can't, you know, just a little bit admit it.
2  You know, so I'm going to have to make a decision.  And I'm
3  happy to get a little brief from you.
4        Tell me when you're going to do that by, because I'd
5  probably want to give the plaintiffs a chance to do something
6  if they wanted to.
7        MS. PERKINS:  We can do that by Wednesday.
8        THE COURT:  All right.  Wednesday close of business.
9        If the defendants want to be heard on that issue,
10  Friday close of business.  Okay?
11        MS. PERKINS:  So would you like -- I'm sorry.
12        Would you like defendant to file first or plaintiff?
13        THE COURT:  No, you, because you're -- you asked to.
14  And I'm letting you.
15        MS. PERKINS:  Okay.  I'm sorry.  I just thought you
16  said defendant on Friday.
17        THE COURT:  I may have.  Sorry.
18        Defendant on Wednesday, close of business; 5 o'clock
19  meaning.
20        And, Plaintiff, if you want to respond, close of
21  business Friday, 5 o'clock.  The response is not required.  But
22  if it's an important issue, you may want to weigh in.
23        And then I'll ponder it over --
24        MR. KELLER:  Thank you, Your Honor.
25        THE COURT:  I'll ponder it over the entire weekend.

1          So anything else from the plaintiffs that we can --

2          MR. BORISON:  Yes, Your Honor.  This is Scott

3    Borison.

4          And the only -- I just wanted to alert the Court, the

5    exhibit list plaintiffs have filed was less than the number

6    that we had provided.  We were going to submit a revised one to

7    include all the exhibits that we had numbered.

8          There was one exhibit that we had said that we would

9    withdraw.  And apparently it caused a renumbering by the

10   defendants.  But we'd like to go back to our original numbers

11   since we had everything prepared in that way.  But I just want

12   to let the Court know that we're going to file a revised

13   plaintiff's exhibit list.

14         THE COURT:  All right.  Well, hopefully y'all can

15   work that out with each other and be on the same page.  And, by

16   the way, if you haven't already done it, if somebody -- you

17   know, if somebody wants to actually see what your exhibits look

18   like, you're -- you know, that's part of the deal.

19         So you can exchange them with each other either

20   electronically or show them to each other, if that's something

21   that people want to do.

22         So if you haven't already done it, you need to make

23   yourself available to try to do that in some way.

24         Anything else from the plaintiff?

25         MR. BORISON:  No, Your Honor.  We have provided all

1    our exhibits to the defendant electronically.

2                THE COURT:  All right.

3                MR. BORISON:  The defendants had changed their

4    exhibit list and dropped some off and renumbered.  And we asked

5    if they could provide us the renumbered exhibits, and -- but

6    we'll deal with them directly.

7                THE COURT:  All right.  That's fine.

8                All right.  What about -- anything else from SoFi?

9                MS. PERKINS:  No.  Thank you, Your Honor.

10               THE COURT:  Anything else from LVNV?

11               MS. BURNETTE:  No, Your Honor.  Thank you.

12               THE COURT:  All right.  Well, this has been fun.

13               And, seriously, I really think this case ought to get

14   settled.  But if it doesn't, then we'll try it, and -- so

15   you'll hear from Judge Barksdale's office about how she wants

16   to handle things.  And she's got your request for

17   attorney-conducted voir dire under consideration.

18               And we -- I have ruled on, I think, 97 percent of the

19   motions in limine.  And I'm likely to just enter an order

20   saying that as stated on the record the motions are -- are

21   ruled upon according to the transcript.

22               So if you want to know what I said or what my rulings

23   are, you need to get a transcript from Ms. Bishop.  And she'll

24   be happy to give one to you, for the right price.

25               Because I'm not going to try to recreate it in an

1    order.  And I think maybe the only issue I haven't ruled on, I

2    think, is the one that we're going to get briefing on, but I'll

3    go back and make sure that's true.

4            I got your trial briefs, and they were -- they were

5    helpful.  I don't -- I don't have anything to discuss with you

6    about those right now, but -- and we're just starting to look

7    at your jury instructions.

8            What I do is I take -- take y'all's jury

9    instructions.  I look at the pattern jury instructions.  I put

10   together what I think are a good set of instructions and a good

11   verdict form.  And then at the appropriate time I hand them

12   back out to you.  And that will be the basis of our charge

13   conference.  And you'll be able to then suggest additions or

14   modifications as necessary.

15           All right.  I think that will do us.

16           Then we are in recess.

17           MR. BORISON:  Thank you, Your Honor.

18           THE COURT:  We'll see y'all next week.

19           MR. KELLER:  Thank you.

20           MS. BURNETTE:  Thank you, Your Honor.

21           MS. PERKINS:  Thank you, Your Honor.

22      (The proceedings concluded at 4:05 p.m.)

23                          - - -

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.


        DATED this 5th day of June, 2024.


                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC